# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JANE DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civ. No. 12-00640 ACK-RLP |
| | ) |
| UNITED STATES of AMERICA; | ) |
| RICHARD SEAMAN; and DOE | ) |
| DEFENDANTS 1-10, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ORDER GRANTING DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR DISMISSAL

### PROCEDURAL BACKGROUND

On November 29, 2012, Plaintiff Jane Doe ("Doe") filed a Complaint against Defendants United States of America (the "Government") and Richard Seaman ("Seaman"). (Doc. No. 1.) On September 24, 2013, the Government filed an Answer to Doe's Complaint. (Doc. No. 18.)

On September 10, 2014, the Government filed the instant Motion for Dismissal and Summary Judgment,[1/] along with a concise statement of facts and exhibits attached thereto. (Doc. Nos. 32 & 33.) On November 17, 2014, Doe filed an Opposition, along with a concise statement of facts and exhibits attached thereto. (Doc. Nos. 40 & 41.) On November 24, 2014, the

---

[1/]Defendant Seaman has not joined the Government's motion.

Government filed a Reply.[2/] (Doc. No. 43.)

The Court held a hearing regarding the Government's motion on December 8, 2014.

## FACTUAL BACKGROUND[3/]

Between September and December 2011, Seaman was employed as a correctional officer with the Bureau of Prisons ("BOP") and assigned to the Federal Detention Center ("FDC") in Honolulu, Hawaii. (Def.'s CSF Ex. 1 at 3.) During that time frame, Seaman engaged in sexual activity, including oral sex, with Doe, a female inmate, while he was supervising her work in the FDC commissary. (Id. at 3-4.) The sexual activity took place in isolated areas of the commissary, or in a storage room behind a closed door. (Id. at 4.) On December 17, 2012, Seaman pled guilty to one count of sexual abuse of a ward in Cr. No. 12-00400 SOM. (Id. at 2.)

In support of the instant motion, the Government submits the declaration of Cully Stearns, Special Investigative Agent for the FDC. Stearns describes the layout of the floor on which the commissary is located and states that, "[a]s a result

---

[2/]The Court expresses its concern that the parties have filed documents without the proper redactions. The Court notes that the parties have recently filed amended documents in order to complete the redactions. (See Doc. Nos. 44 & 47-49.)

[3/]The facts as recited in this Order are for the purpose of disposing of the current motion and are not to be construed as findings of fact that the parties may rely on in future proceedings.

of this layout, there is considerable foot traffic going past the commissary during business hours." (Stearns Decl. ¶ 3.) Stearns further states that

> [t]he door to the commissary has an elongated window from which individuals can see to the back commissary wall. Inside the commissary to the right as you enter is the staff office which has windows on nearly the entire length of the facing wall and a large window on the wall of the office facing the rear of the commissary.

(Id. ¶ 4.) According to Stearns, the FDC utilizes video surveillance to monitor the facility, but that the exact location and capabilities of the video surveillance is generally not provided to inmates or staff. (Id. ¶ 5.) Stearns also certifies log book entries indicating that, on several dates between September and December 2011, Doe was taken out of her housing unit with other inmates to work in the commissary. (Id. ¶ 6; Def.'s CSF Ex. 5.)

The Government also submits the declaration of David Carl, Correctional Services Administrator for the BOP's Western Regional Office. Carl states that the BOP has "no rule, policy, practice, or procedure that [] prevent[s] one staff member from supervising one inmate, outside the presence of other staff members or video cameras, under normal circumstances." (Carl Decl. ¶ 2.) Similarly, Carl states that the BOP has "no rule, policy, practice, or procedure" that "requires all areas of a correctional facility to be subject to video monitoring" or that

"prohibits staff from going into areas that are not subject to video monitoring while supervising inmates." (Id. ¶ 3.)

In opposition to the instant motion, Doe submits the affidavit of another female inmate at the FDC ("Doe 2"). In this affidavit, dated February 15, 2007, Doe 2 alleges that, from January to February 2007, Seaman committed several acts of misconduct against her while he was supervising her work in the commissary detail. (Pl.'s CSF Ex. A.) Without citing any authority, the Government states in its motion that Doe 2 "later admitted her claim was false." (Mot. at 12.) At the December 8 hearing, Doe verified the Government's statement and told the Court that Doe 2 did in fact recant her allegations.

Seaman testified during his deposition that the FDC investigated whether he engaged in sexual misconduct with Doe 2, but that no action was taken as a result of the investigation. (Pl.'s CSF Ex. C at 42:7-43:15.) Seaman testified that the FDC did not provide him additional training or supervision in light of the sexual misconduct investigation. (Id. at 44:24-45:5.)

As to Plaintiff Doe, Seaman testified that he engaged in sexual activity with her on five separate occasions between September and December 2011. (Id. at 25:13-25:18.) Seaman testified that, each time he had sexual relations with Doe, he would make "special arrangements" to ensure "that the two of [them] would be alone." (Def.'s CSF Ex. 6 at 25:19-25:23.)

4

According to Seaman, Doe "cooperate[d] in [these] arrangements" by "agree[ing] to come along with me." (Id. 25:24-26:3.) Seaman further testified that all sexual activity took place in areas of the facility that were not covered by cameras and that he knew this at the time. (Pl.'s CSF Ex. C at 40:4-40:9.) Seaman also testified that it was common knowledge among the FDC staff that there were areas in the facility that were not monitored by camera and that incidents of sexual misconduct had taken place in these areas. (Id. at 40:10-40:14; 41:4-41:23.)

Seaman testified that he and Doe sent dozens of emails to each other. (Def.'s CSF Ex. 6 at 30:1-30:25.) Seaman testified that he used a personal email address and sent the emails outside of "institutional grounds." (Id.) Seaman also testified that there was a prison rule prohibiting correctional officers from emailing inmates. (Id.)

Seaman also testified as to the extent of his sexual misconduct training:

> Q [by Mr. Helper, counsel for the
> Government]: Did you receive training before
> you started, your initial training, on social
> or sexual interaction with inmates?
> A: During institution familiarization and at
> Glynco, yes.
> Q: Okay. And describe for me what training
> you received.
> A: It was - from what I remember, it was
> basically the same thing. They just go over
> what to do and what not to do.
> Q: Okay. Well, tell me what they said.
> A: Okay. Well, that interaction that -
> illegal sexual contact between inmates is

illegal and that you can face incarceration.
Q: Is there any - is there such thing as
legal sexual contact with an inmate?
A: Not in an - not in an institution.
. . .
Q [by Mr. Seitz, counsel for Doe]: And just
going back to some of the questions that you
were asked earlier by Mr. Helper, the only
training that you ever received regarding
sexual misconduct by staff involving inmates
was approximately an hour on a couple of
occasions; is that correct?
A: Once a year.
Q: Once a year.
A. (Nods head up and down).
Q. And it consisted just simply of an hour of
training; is that right?
A: Yes, sir.
Q: And all that basically consisted of was
warnings or admonitions that sexual contacts
or social relationships with inmates was
inappropriate and illegal; is that fair to
say?
A: Yes, sir.
Q: Was there ever any training given to you
about how to avoid those kinds of contacts?
A: No, sir.

(Id. Ex. 6 at 11:5-11:21; Pl.'s CSF Ex. C at 48:4-48:22.)

Seaman testified that, outside of this formal training, he was

advised by two supervisors, Mr. Montoya and Mr. George, "that it

wasn't wise to be alone with a female inmate by yourself." (Id.

at 21:5-22:9.)

    Finally, in opposition to the Government's motion, Doe

submits the expert report of Wendy S. Still, M.A.S. (Id. Ex. D.)

In her report, Ms. Still states that she was retained as an

expert on "women offenders, gender responsive strategies for

female prisoners, prison rape elimination and sexual assault

6

prevention of female prisoners in detention." (Id. at 7.) Ms.

Still states that her report addresses the following questions:

> Did [the Government] fail to protect [Doe]
> from multiple sexual assaults by [] Seaman at
> the [] FDC from September 2011 to December 8,
> 2011 and violate her constitutional rights?
> Additionally, did the [Government] through
> the [BOP] know or should they have known of
> the risks of unsupervised female inmates and
> male employees being permitted into isolated
> areas and rooms that would lead to the
> endangerment and sexual assault of [Doe]? Did
> the [Government] through the BOP fail to
> revise and implement the necessary
> institutional policies and procedures to
> protect [Doe] from sexual assault? Did the
> [Government] through the [BOP] negligently
> supervise the inmate population to the
> detriment of ensuring inmate safety and fail
> to take the proper steps in hiring, training
> and supervising BOP employee [Seaman]?

(Id. at 7-8).

Ms. Still bases her opinion in part on the Prison Rape

Elimination Act ("PREA"), 42 U.S.C. § 15601 et seq. (Id. at 11-

17.) Ms. Still states that the PREA established a National Prison

Rape Reduction Commission ("Commission") to study the impact of

prison rape, and prepare a report that includes, inter alia, the

Commission's findings and conclusions, as well as recommended

national standards for reducing prison rape. (Id. at 13.) Ms.

Still notes that, under the PREA, the Commission is required to

submit the report to the Attorney General and others. (Id.) She

notes that, after receiving the report, the Attorney General is

required to submit "draft PREA standards" and "final PREA

standards" for "the detection, prevention, reduction and punishment of prison rape." (Id. at 13-14.) Ms. Still states that on February 11, 2011, the Attorney General issued the draft PREA standards. (Id. at 14.) She states that the Attorney General issued the final PREA standards on May 17, 2012, some months after the last incident of sexual activity between Seaman and Doe. (Id.)

Ms. Still further states that, during the interim period between the issuance of the draft PREA standards and the final PREA standards, each federal jurisdiction had a responsibility "to develop policies, operational practices and training to ensure inmates are safe and protected from sexual assault." (Id. at 14.) According to Ms. Still, the FDC "failed to perform their PREA related responsibilities during the interim period" by "develop[ing] policies, operational practices and training to ensure inmates are safe and protected from sexual assault." (Id. at 18.) To the contrary, Ms. Still states that although the FDC developed some policies "related to working with women offenders and sexual misconduct," these policies were inadequate to protect female inmates like Doe from sexual assault. (Id. at 18-19.)

Ms. Still also states that Seaman completed 760 hours of training from June 27, 2001, to March 23, 2012, including a 40 hour course entitled "Working With Female Offenders" on December

23, 2002. (Id. at 19.) Ms. Still further states that Seaman participated in "annual refresher training," which "included information specifically identifying that any type of sex with an inmate is against the law." (Id.) The Court notes that Seaman received approximately ten hours of annual refresher training prior to the occurrence of the subject incidents. (See Pl.'s CSF Ex. C at 48:4-48:22 (Seaman testified that he received one hour of training regarding sexual relations with inmates per year); and Pl.'s CSF Ex. D at 11 (Ms. Still states that Seaman was employed at the FDC from 2001 until July 2012).)

Although hardly a model of clarity, Ms. Still appears to state in a section entitled "Policy Concerns" that the FDC has conducted training programs related to sexual misconduct. (Pl.'s CSF Ex. D at 19-22.) These programs include "Institution Supplement Sexually Abusive Behavior Prevention & Intervention Program" and "Institution Supplement Management of Female Offenders." (Id. at 20.) According to Ms. Still, these training programs were inadequate because, inter alia, they "were not gender responsive for female inmates." (Id. at 21.)

Moreover, in a section entitled "Other Reported Cases of Sexual Assaults at the [FDC]," Ms. Still states that there were four reported cases of sexual assault involving FDC staff members between 2003 and 2007. (Id. at 22-24.) According to Ms. Still, one substantiated case of sexual assault involved the rape

9

of a female inmate on September 28, 2007, that "took place in a
broom closet where no visibility existed." (Id. at 24.) Ms. Still
further states that two of the four cases involved the same FDC
staff member and were not substantiated, but that one staff
person resigned during the investigation. (Id. at 23.) She states
the fourth case involved Doe 2's allegations against Seaman.
(Id.) However, Ms. Still fails to note that Doe 2 later recanted
these allegations.[4]

Based on the foregoing, Ms. Still's opinions are as
follows:

> It is this expert's preliminary opinion that
> the [] Government breached a clearly
> established duty to protect [Doe] by failing
> to protect [her] from multiple sexual
> assaults as mandated by the [PREA]. It is
> also this expert's opinion that the BOP and
> Institutional Management did not protect []
> Doe's constitutional rights as required by
> the [PREA]. The institutional conditions
> clearly created an environment that placed
> the health and safety of [] Doe at risk of
> sexual abuse because institutional management
> failed to appropriately supervise and monitor
> [] Doe's safety by failing to address the
> multiple blind spots in the isolated
> commissary area with technology (cameras) or
> physical plant modifications. [The] FDC
> management was also aware of multiple
> allegations of sexual misconduct and actual
> sexual assault of female inmates at [the] FDC
> by facility staff and failed to prevent and
> protect female inmates from further sexual
> assault and abuse by failing to revise
> policies [and] staffing, and make the
> necessary physical plant modifications

_____

[4]The Court is troubled by Ms. Still's critical omission.

including adding the video surveillance
equipment necessary to prevent sexual
assaults from occurring at the [] FDC. []
Seaman violated [the PREA] as well as failed
to uphold his sworn oath to protect [] Doe
when he premeditatedly planned to assault []
Doe by intentionally removing her from her
housing unit, isolating her in the Commissary
area, and then sexually assaulting her
multiple times as well as subjecting her to
ongoing verbal sexual harassment [from
September to December 2011].

(Id. at 25-26.)

## STANDARD

Federal Rule of Civil Procedure ("Rule") 12(b)(1)
authorizes the Court to dismiss a complaint for lack of subject
matter jurisdiction. A Rule 12(b)(1) motion may either (1)
"attack the allegations of the complaint as insufficient to
confer subject matter jurisdiction on the court" ("facial
attack") or (2) "may attack the existence of subject matter
jurisdiction in fact" ("factual attack"). Malama Makua v.
Rumsfeld, 136 F.Supp.2d 1155, 1159 (D. Haw. 2001). For a facial
attack on subject matter jurisdiction, "all allegations of
material fact are taken as true and construed in the light most
favorable to the nonmoving party." Malama, 136 F. Supp. 2d at
1159. On the other hand, for a factual attack, "no presumptive
truthfulness attaches to the plaintiff's allegations, and the
existence of disputed material facts will not preclude the trial
court from evaluating for itself the existence of subject matter
jurisdiction in fact." Id. at 1159-60.

11

"Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." Robinson v. United States, 586 F.3d 683, 685 (9th Cir. 2009). Moreover, once the party bringing the Rule 12(b)(1) motion presents evidence or other affidavits before the court challenging jurisdiction, the party opposing the motion must present affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). Furthermore, when considering a Rule 12(b)(1) motion to dismiss, the district court may "hear evidence regarding jurisdiction" and "resolve factual disputes where necessary." Robinson, 586 F.3d at 685.

In this case, the Government brings a factual attack to the Court's subject matter jurisdiction, and attaches two declarations and several exhibits to the instant motion. See Meyer, 373 F.3d at 1039 (attack on subject matter jurisdiction is considered factual if the attack relies on extrinsic evidence and does not rely solely on the pleadings).

## DISCUSSION

Doe's Complaint contains seven counts. Counts I to III raise claims against Seaman individually, not against the Government. Counts IV through VII assert claims against the Government for constitutional and § 1983 violations (Count IV); negligence (Count V); negligent training, supervision, and

discipline (Count VI); and negligent infliction of emotional distress (Count VII). At the December 8 hearing, Doe voluntarily withdrew her constitutional and § 1983 claims against the Government (Count IV). Thus, the only claims that remain against the Government are contained in Counts V through VII.

The Government seeks dismissal of Doe's remaining claims against it on the grounds that (1) the claims are barred under the Federal Tort Claim Act's ("FTCA") physical injury requirement and (2) the claims are barred by the discretionary function exception to the FTCA. The Court will address these grounds in turn.

**I.      Whether Doe's Claims are Barred under the FTCA's Physical Injury Requirement**

"The FTCA provides a waiver of the United States government's sovereign immunity for tort claims arising out of the conduct of government employees acting within the scope of their employment." <u>Adams v. United States</u>, 420 F.3d 1049, 1051 (9th Cir. 2005). However, this waiver is subject to several limitations. One of these limitations is found in 28 U.S.C. § 1346(b)(2), which was amended in 2013 and currently provides:

> No person convicted of a felony who is
> incarcerated while awaiting sentence or while
> serving a sentence may bring a civil action
> against the United States or an agency,
> officer, or employee of the Government, for
> mental or emotional injury suffered while in
> custody without a prior showing of physical
> injury or the commission of a sexual act (as
> defined in section 2246 of Title 18).

13

<u>Id.</u> Similarly, the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), was amended in 2013 and currently provides:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

<u>Id.</u> Given the similar language between §§ 1346(b)(2) and 1997e(e), the Court will rely upon cases interpreting either statute.

As an initial matter, the Court notes that § 1346(b)(2) is only applicable to plaintiffs who are incarcerated at the time the action is filed. <u>Id.</u> ("No person convicted of a felony who is *incarcerated while awaiting sentence* or *while serving a sentence* may bring a civil action. . .") (emphasis added); <u>see</u> <u>also</u> <u>Harris v. Garner</u>, 216 F.3d 970, 979-80 (11th Cir. 2000) (finding that § 1997e(e) "applies only to claims filed while an inmate is confined"). In this case, Doe filed her Complaint while she was incarcerated at the FDC. (<u>See</u> Doc. No. 1 (complaint filed on November 29, 2012) and Doc. No. 43-2 at 4 (Doe stated during her deposition that she was incarcerated at the FDC from August 2009 to June 10, 2013).)

The Court further notes that § 1346(b)(2) expressly provides that plaintiffs may bring claims for mental or emotional injury if a "sexual act" is committed against them. However, the

14

language "or the commission of a sexual act (as defined in section 2246 of Title 18)"[5/] was only added to § 1346(b)(2), and § 1997e(e), on March 7, 2013. See Pub. L. 113-4, Title XI, §§ 1101(a)-(b), 127 Stat. 54. Because Doe's claims arise from conduct which occurred between September and December 2011, and because Doe filed her Complaint on November 29, 2012, the Court must determine whether the 2013 amendment to § 1346(b)(2) applies retroactively.

Neither the amendment's text, its legislative history, nor case law indicates that the amendment is to be applied retroactively. Further, the Ninth Circuit has held that the pre-amendment version of § 1997e(e) does not apply retroactively. Swan v. Banks, 160 F.3d 1258, 1259 (9th Cir. 1998) (finding "that the plain meaning of the [pre-amendment version of § 1997e(e)] is that it applies only to actions that were brought after enactment of the PLRA, and not to actions that had already been filed"). Additionally, the Supreme Court has made clear that there is a strong presumption against retroactive application of legislation. Landgraf v. USI Film Products, 511 U.S. 244, 265 (1993) (". . . [T]he presumption against retroactive legislation

_____

[5/]18 U.S.C. § 2246 defines "sexual act" to mean, inter alia, "contact between the mouth and the penis" and "the penetration, however slight, of the anal or genital opening of another by a hand or finger . . . with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." Id. §§ 2246(2)(B)-(C).

is deeply rooted in our jurisprudence, and embodies a legal
doctrine centuries older than our Republic."). The Supreme Court
has also made clear that courts examining if a federal statute
should be applied retroactively should consider whether the
provision "increase[s] a party's liability for past conduct". Id.
at 280. It therefore appears that the 2013 amendment to §
1346(b)(2) does not apply retroactively.

Thus, the remaining issue is whether Doe suffered a
"physical injury" within the meaning of § 1346(b)(2).

In Oliver v. Keller, 289 F.3d 623 (9th Cir. 2002), the
Ninth Circuit interpreted § 1997e(e), which, like § 1346(b)(2),
requires plaintiffs to show a "physical injury" before they can
assert mental or emotional injury claims. The Oliver court noted
that "the phrase 'physical injury' does not wear its meaning on
its face" and that, "[i]n drafting § 1997e(e), Congress failed to
specify the type, duration, extent, or cause of 'physical injury'
that it intended to serve as a threshold qualification for mental
and emotional injury claims." Oliver, 289 F.3d at 626. After
surveying prior case law, the Oliver court held "that for all
claims to which it applies, 42 U.S.C. § 1997e(e) requires a prior
showing of physical injury that need not be significant but must
be more than de minimis." Id. at 627. Applying this standard to
the facts before it, the Ninth Circuit found that an inmate's
back and leg pain, which the inmate described as "nothing too

16

serious," and canker sore were "not more than *de minimis*." Id. at 629.

Neither Oliver nor other Ninth Circuit decisions address the FTCA's or PLRA's physical injury requirement in the context of claims based on a sexual assault. However, the Second Circuit and several federal district courts have done so. These courts "applied a 'common sense' approach and found that sexual assault qualified as 'more than a *de minimis* injury[.]'" Cleveland v. Curry, Case No. 07-cv-02809-NJV, 2014 WL 690846, at *6 (N.D. Cal. Feb. 21, 2014) (citing Liner v. Goord, 196 F.3d 132, 135-36 (2d Cir. 1999) (while there is no "statutory definition of 'physical injury'" in the PLRA, the "alleged sexual assaults qualify as physical injuries as a matter of common sense. Certainly, the alleged sexual assaults would constitute more than a *de minimis* injury if they occurred"); Carrington v. Easley, No. 5:08-CT-3175-FL, 2011 WL 2132850, at *3 (E.D. N.C. May 25, 2011) (holding on default judgment in case where plaintiff alleged a guard ordered him to undergo strip search and unsuccessfully attempted to fellate him that "a sexual assault qualifies as a 'physical injury' under the PLRA. . . . [E]ven absent physical injury, sexual assault is an injury of 'constitutional dimensions' as to which the PLRA does not bar recovery"); Marrie v. Nickels, 70 F.Supp.2d 1252, 1257 (D. Kan. 1999) (holding in case where guard was alleged to have stroked

the buttocks and genitalia of inmates during frisk search that such "sexual assaults would qualify as physical injuries under § 1997e(e)")).

This Court concludes that Doe's mental and emotional injury claims are not barred by the FTCA's physical injury requirement. Although Seaman's "acts were not preceded by physical uses of force" and did not leave "any physical injuries," Opp. at 10, the Court, consistent with the authorities cited directly above, finds that common sense and public policy dictates that Doe should be able to pursue mental and emotional injury claims arising out of Seaman's sexual assault. As the Cleveland court explained,

> . . . [O]nly certain types of sexual assault will cause objective and observable physical injuries, but any type of sexual assault is "always" deeply offensive to human dignity. As a matter of policy and of common sense, it would be illogical to allow guards who (through happenstance or planning) assault prisoners without leaving observable physical injuries to escape liability under the PLRA because they have only caused psychological, emotional, dignitary and other injuries. . . . [U]nlike in other situations where guards are accused of using "excessive" force, there can be no justification for sexually abusive conduct in a prison setting in any context; there is no level of sexual force that is "acceptable" due to exigent circumstances or the realities of prison life. No use of sexual force is required to maintain discipline. No prisoner can resist an order or behave in a manner that justifies, much less requires, sexual abuse by a guard.

Cleveland, 2014 WL 690846, at *7.

This Court's conclusion is also consistent with <u>Oliver</u>. There, the Ninth Circuit stated it was following the approach of the Second Circuit and cited with approval that circuit's decision in <u>Liner</u>, which held that an alleged sexual assault, if proven, "would constitute more than 'de minimis' injury" and thus was "sufficient under § 1997e(e) to sustain a § 1983 claim." <u>Oliver</u>, 289 F.3d at 627 (citing <u>Liner</u>, 196 F.3d at 135). Further, the Ninth Circuit explained that its interpretation of § 1997e(e) was based on Congressional intent in passing the PLRA, which was to curtail frivolous prisoner litigation. <u>Id.</u> at 627-28. That rationale does not apply here because Doe's claims are not frivolous: both parties agree that Seaman sexually assaulted Doe.

For these reasons, the Court holds that Doe's mental and emotional injury claims are not barred by the FTCA's physical injury requirement.

## II.     Whether Doe's Claims Are Barred by the Discretionary Function Exception to the FTCA

Another limitation on the waiver of the Government's sovereign immunity under the FTCA is found in 28 U.S.C. § 2680(a). That statute provides that the FTCA does not waive immunity for any claim that is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." <u>Id.</u> The discretionary function exception to the FTCA

19

"marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." <u>Berkovitz v. United States</u>, 486 U.S. 531, 536 (1988).

Courts apply a two-part test to analyze whether the discretionary function exception bars a particular claim. <u>Alfrey v. United States</u>, 276 F.3d 557, 561 (9th Cir. 2002).

First, the court must decide "whether the challenged conduct is discretionary, that is, whether it 'involv[es] an element of judgment or choice.'" <u>Id.</u> (quoting <u>Fang v. United States</u>, 140 F.3d 1238, 1241 (9th Cir. 1998)) (alteration in original). "This element is not met 'when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow.'" <u>Id.</u> (quoting <u>Fang</u>, 140 F.3d at 1241).

Second, if the challenged conduct is discretionary, the court "must determine whether that judgment is of the kind that the discretionary function was designed to shield." <u>Id.</u> (quoting <u>Berkovitz</u>, 486 U.S. at 536). The purpose of the discretionary function exception is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." <u>Berkovitz</u>, 486 U.S. at 536-57. Thus, the discretionary

function exception protects "only governmental actions and decisions based on considerations of public policy." Id. at 537. "It is not necessary for the [G]overnment to prove a conscious decision based on a policy analysis." Weissich v. United States, 4 F.3d 810, 813 (9th Cir. 1993). "It is enough that the choice is one to which a policy analysis may apply." Id.

If the discretionary function exception applies to a particular claim, the court lacks subject matter jurisdiction over that claim and that claim must be dismissed. Bibeau v. Pac. Nw. Research Found. Inc., 339 F.3d 942, 945 (9th Cir. 2003). Although the burden of proving the applicability of the discretionary function exception lies with the Government, "a plaintiff must advance a claim that is facially outside the discretionary function exception in order to survive a motion to dismiss." Doe v. Holy See, 557 F.3d 1066, 1084 (9th Cir. 2009).[6]

**A. Negligence Claims (Count V)**

In Count V, Doe alleges "negligence claims." (Compl. ¶ 33.) Specifically, Doe alleges that the FDC allowed Seaman to be alone with her in unsupervised and unmonitored areas of the facility and thus "caused [her] to be in a situation where she

_____

[6]While Holy See discussed the discretionary function exclusion contained in the Foreign Sovereign Immunities Act ("FSIA"), the court noted that "[t]he language of the discretionary function exclusion closely parallels the language of a similar exclusion in the" FTCA and that the court would "look to case law on the FTCA when interpreting the FSIA's discretionary function exclusion." Holy See, 557 F.3d at 1083.

was sexually assaulted." (Id.)

Regarding the first prong of the discretionary function exception test, the Court examines Ms. Still's expert report to assess whether there was a federal statute, regulation, or policy that specifically prescribed a course of action for the FDC to follow. As discussed, Ms. Still's report includes the draft PREA standards for "the detection, prevention, reduction and punishment of prison rape."[7/] (Pl.'s CSF Ex. D at 13.) The draft PREA standards provide:

**§ 115.13 Supervision and monitoring.**

(a) For each facility, the agency shall determine the adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse. In calculating such levels, agencies shall take into consideration the physical layout of each facility, the composition of the inmate population, and any other relevant factors.

(b) The facility shall also establish a plan for how to conduct staffing and, where applicable, video monitoring, in circumstances where the levels established in paragraph (a) of this section are not attained.

(c) Each year, the facility shall assess, and determine whether adjustments are needed to: (1) The staffing levels established pursuant to paragraph (a) of this section; (2) Prevailing staffing patterns; and (3) The agency's deployment of video monitoring

---

[7/]Ms. Still's report also includes the final PREA standards. However, the Court will not consider these standards because they were issued after December 2011, the last month in which Seaman and Doe engaged in sexual activity at the FDC.

systems and other technologies.

> (d) Each prison facility . . . whose rated
> capacity exceeds 500 inmates, shall implement
> a policy and practice of having intermediate-
> level or higher-level supervisors conduct and
> document unannounced rounds to identify and
> deter staff sexual abuse and sexual
> harassment.

(Id. at 14-15.) Under the draft PREA standards, the FDC appears

to have discretion when making decisions as to staffing, video

monitoring and the like. Thus, it appears that the draft PREA

standards do not specifically prescribe a course of action for

the FDC to follow with respect to these decisions. See Holy See,

557 F.3d at 1084 (finding that the plaintiff did not allege "the

existence of a policy that is 'specific and mandatory' on the

[defendant]) (quoting Kennewick Irrigation Dist. v. United

States, 880 F.2d 1018, 1026 (9th Cir. 1989) (emphasis in

original) (noting that Berkovitz v. United States, 486 U.S. 531

(1988) "establishes that a safety or engineering standard

operates to remove discretion under the FTCA when it is embodied

in a specific and mandatory regulation or statute which creates

clear duties incumbent upon the governmental actors")).

Ms. Still's report states that the FDC failed to

develop policies during the interim period between the issuance

of the draft PREA standards and the final PREA standards that

ensured inmates were safe from sexual assault. (Pl.'s CSF Ex. D

at 18.) Specifically, she states that although the FDC developed

some policies "related to working with women offenders and sexual misconduct," these policies were inadequate to prevent sexual assaults against female inmates like Doe. (Id. at 18-19.) As noted, the first requirement of the discretionary function exception test is "whether the challenged conduct is discretionary, that is, whether it involves an element of judgment or choice." Alfrey, 276 F.3d at 561 (internal quotation marks and alteration omitted). This requirement is not met if "a federal statute, regulation or policy *specifically prescribes* a course of action." Id. (emphasis added). Although Ms. Still generally states that the FDC's policies during the interim period were inadequate, she does not identify what these policies entailed and what specific course of action took place. Thus, Ms. Still's report does not defeat the first prong of the discretionary function exception test.

In addition to Ms. Still's report, the Court considers the deposition testimony of Seaman. During his deposition, Seaman testified that he was advised by two supervisors, Mr. Montoya and Mr. George, "that it wasn't wise to be alone with a female inmate by yourself." (Pl.'s CSF Ex. C 21:5-22:9.) The word "wise," of course, indicates discretion. At the December 8 hearing, Doe argued that this testimony shows that, at the very least, there is a genuine issue of material fact as to whether the FDC had a policy prohibiting male correctional officers from being alone

with female inmates. As will be explained, the Court disagrees.

The Ninth Circuit has confronted a somewhat similar factual situation as the one before this Court. <u>Doe v. United States</u>, 510 Fed. Appx. 614 (9th Cir. 2013) ("<u>Doe</u> II"). In <u>Doe</u> II, an inmate brought FTCA claims after she was sexually assaulted by a BOP electrician ("Milsap") at the FDC. <u>Id.</u> at 615-16. One of the inmate's claims arose from the alleged negligence of a correctional officer ("Cruz"), who left her in an unsupervised closet with Milsap. <u>Id.</u> The relevant portion of the Ninth Circuit's opinion provides:

> Here, Cruz stated to FBI investigators that, during training, he had been told not to go into an area that lacks video surveillance alone with a female inmate. Viewed in the light most favorable to Plaintiff, that statement suggests that the prison had a mandatory policy against putting female inmates in the same kind of situation in which Cruz left Plaintiff with Bureau of Prisons electrician Markell Milsap. Although Cruz later characterized the instruction that he received during training as a strong "suggestion," that testimony merely creates a factual dispute as to whether the prison policy against leaving inmates alone with individual prison employees was mandatory or discretionary. . . . Because Cruz may have violated a mandatory policy, the district court erred in ruling, as a matter of law, that his decisions involved an "element of judgment or choice."

<u>Id.</u> (citations omitted).

Here, unlike in <u>Doe</u> II, there is not a factual dispute as to whether the FDC had a mandatory policy against leaving

inmates alone with correctional officers. The Government submits the declaration of David Carl, Correctional Services Administrator for the BOP's Western Regional Office, who unequivocally states that, during the relevant time period, the FDC had "no rule, policy, practice, or procedure that [] prevent[ed] one staff member from supervising one inmate, outside the presence of other staff members or video cameras." (Carl Decl. ¶ 2.) Thus, <u>Doe</u> II is distinguishable from the instant case, and Seaman's supervisor's statements do not create a factual dispute as to whether the FDC had a mandatory policy barring male correctional officers from being alone with female inmates.

To summarize, Doe has failed to point to any federal statute, regulation, or policy that specifically prescribed a course of action for the FDC to follow.[8/] Moreover, the Supreme Court has stated that prison authorities "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." <u>Bell v. Wolfish</u>, 441 U.S. 520, 527 (1979);

---

[8/]The Court notes that Seaman testified during his deposition that he communicated via email with Doe and that there was a prison rule prohibiting correctional officers from emailing inmates. (Def.'s CSF Ex. 6 at 30:1-30:25.) The Court further notes that Doe does not assert any negligence claims arising from these email communications.

see also Rhodes v. Chapman, 452 U.S. 337, 349 n. 14 (1981)
(finding that "a prison's internal security is peculiarly a
matter normally left to the discretion of prison
administrators"). It therefore appears that the first prong of
the discretionary function exception test is satisfied.

Turning to the second prong of the discretionary
function exception test, it appears that the FDC's decision to
leave Seaman alone with Doe in unsupervised and unmonitored areas
of the facility is susceptible to a policy analysis. See Dykstra
v. U.S. Bureau of Prisons, 140 F.3d 791, 796 (8th Cir. 1998)
("Prison officials supervise inmates based upon security levels,
available resources, classification of inmates, and other
factors. These factors upon which prison officials base such
decisions are inherently grounded in social, political, and
economic policy."); see also Alfrey, 276 F.3d at 564-65 (finding
that "balancing the need to provide inmate security with the
rights of inmates to circulate and socialize within the prison
involves considerations based upon public policy").

For the foregoing reasons, the Court concludes that
Doe's negligence claims fall within the discretionary function
exception. Accordingly, Doe's negligence claims (Count V) are
dismissed for lack of subject matter jurisdiction.

### B. Negligent Training, Supervision and Discipline Claims (Count VI)

In Count VI, Doe alleges that the Government

27

negligently trained, supervised and disciplined Seaman. (Compl. ¶¶ 36-37.) In particular, Doe alleges that the Government failed to provide Seaman appropriate training, supervision, and discipline in light of Doe 2's 2007 sexual misconduct allegations and other reported cases of sexual assaults at the FDC. (Id. ¶¶ 15-16, 34 & 36-37.)

As to the first prong of the discretionary function exception test, courts have held that decisions relating to the training of employees are discretionary.[9] See Holy See, 557 F.3d at 1084 (noting that the Ninth Circuit has held the training of employees to be a discretionary act); Nurse v. United States, 226 F.3d 996, 1001 (9th Cir. 2000) (finding that claims for negligent training "fall squarely within the discretionary function exception"); Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d 1207, 1217 (D.C. Cir. 1997) (holding that decisions concerning the training of employees are discretionary in nature and, therefore, immune from judicial review).

Courts have also found that decisions concerning the supervision of employees are discretionary. See Holy See, 557 F.3d at 1084 (noting that the Ninth Circuit has "held the . . .

_____

[9] The Court notes that, as discussed in Ms. Still's report, Seaman completed 760 hours of training, including a 40 hour course entitled "Working With Female Offenders" and approximately ten hours of "annual refreshing training," which "specifically identif[ied] that any type of sex with an inmate is against the law." (Pl.'s CSF Ex. D at 19.)

supervision . . . of employees to be discretionary acts"); <u>Nurse</u>,
226 F.3d at 1001 (finding that claims for negligent supervision
"fall squarely within the discretionary function exception");
<u>Burkhart</u>, 112 F.3d at 1217 (holding that decisions concerning the
supervision of employees are discretionary in nature and,
therefore, immune from judicial review); <u>Attallah v. United
States</u>, 955 F.2d 776, 784 (1st Cir. 1992) (noting that "how, and
to what extent the [United States] Customs Service supervises its
employees certainly involves a degree of discretion").

Finally, courts have determined that decisions relating
to the discipline of employees are discretionary. <u>See</u>, <u>e.g.</u>,
<u>C.A.C. v. U.S.</u>, Civil Action No. 09-06057(JAP), 2010 WL 5239237,
at *3 (D. N.J. Dec. 16, 2010) (finding that decision about
whether and how to investigate or discipline a lieutenant colonel
for alleged sexual assaults against infants, and who now stood
accused of a different sexual assault against plaintiff infant,
involved "an element of choice").

Turning to the second prong, courts have found that
decisions relating to the training, supervision, and discipline
of employees involve the type of judgment that the discretionary
function exception was designed to shield. <u>See</u> <u>Vickers v. United
States</u>, 228 F.3d 944, 950 (9th Cir. 2000) (concluding "that
decisions relating to the hiring, training, and supervision of
employees usually involve policy judgments of the type Congress

intended the discretionary function exception to shield."); Holy See, 557 F.3d at 1084 (noting that "the decision of whether and how to retain and supervise an employee, as well as whether to warn about his dangerous proclivities, are the type of discretionary judgments that the exclusion was designed to protect"); Burkhart, 112 F.3d at 1217 (holding that "supervision choices . . . are choices susceptible to policy judgment"); Tonelli v. United States, 60 F.3d 492, 496 (8th Cir. 1995) (noting that "[i]ssues of employee supervision . . . generally involve the permissible exercise of policy judgment and fall within the discretionary function exception"); Attallah, 955 F.2d at 784 (finding that "how, and to what extent the [United States] Customs Service supervises its employees certainly involves . . . policy considerations of the kind that Congress sought to protect through the discretionary function exception"); C.A.C., 2010 WL 5239237, at *3 (finding that decision about whether and how to investigate or discipline a lieutenant colonel for alleged sexual assaults against infants, and who now stood accused of a different sexual assault against plaintiff infant, was "based on policy analysis").

For these reasons, Doe's negligent training, supervision and discipline claims (Count VI) fall within the discretionary function exception. Thus, these claims are dismissed for lack of subject matter jurisdiction.

30

### C. Negligent Infliction of Emotional Distress Claims (Count VII)

In Count VII, Doe alleges claims for negligent infliction of emotional distress ("NIED"). (Compl. ¶ 39.) It appears that Doe's NIED claims are derivative of her claims in Counts V and VI. <u>See</u> <u>First Ins. Co. of Hawaii, Ltd. v. Lawrence</u>, 77 Haw. 2, 9 n. 10 (Haw. 1994) (defining "derivative" to mean "that which has not its origin in itself, but owes its existence to something foregoing") (alteration omitted). Because the Court has concluded that it lacks subject matter jurisdiction over the claims in Counts V and VI, it therefore appears that it lacks subject matter jurisdiction over Doe's NIED claims (Count VII).[10]

### CONCLUSION

For the foregoing reasons, the Court GRANTS the Government's motion for dismissal. All claims against the Government are dismissed without prejudice and with leave to amend for lack of subject matter jurisdiction. Doe has thirty (30) days from the issuance of this Order to file any amended complaint. The Court CAUTIONS Doe that, if she fails to timely file an amended complaint, the claims which the Court has dismissed without prejudice will be automatically dismissed with prejudice.

---

[10]Because Doe's claims are barred by the discretionary function exception to the FTCA, the Court need not address the Government's alternative argument that Doe's claims are barred by Hawaii law.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, December 17, 2014.



_____

Alan C. Kay
Senior United States District Judge

<u>Doe v. United States of America et al.</u>, Civ. No. 12-00640 ACK-RLP: ORDER
GRANTING DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR DISMISSAL